**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KEVIN HURST, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO.    13-5568 |
| SIEMENS CORPORATION GROUP | : | |
| INSURANCE AND FLEXIBLE HEALTH | : | |
| PROGRAMS and CIGNA BEHAVIORAL | : | |
| HEALTH, INC. | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                                                      August 26, 2014

        Currently pending before the Court is Defendants Siemens Corporation Group Insurance

and Flexible Health Programs ("Siemens") and Cigna Behavioral Health, Inc. ("CBH")

(collectively, "Defendants")'s Motion for Summary Judgment as to all claims asserted by

Plaintiff Kevin Hurst ("Plaintiff").  For the following reasons, Defendants' Motion for Summary

Judgment is granted.

## I.  FACTUAL HISTORY[1]

        Defendant Siemens is an employee welfare benefit plan ("the Plan") established by

Siemens Corporation pursuant to ERISA, which is designed to provide health benefits to eligible

employees and their dependents.  (Defs.' Mem. Supp. Summ. J. 2.)  Defendant CBH is the

---

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence
submitted in conjunction with those briefs. To the extent the parties allege a fact that is
unsupported by evidence, the Court does not include it in the recitation of facts.

designated claim administrator for Siemen's Mental Health and Substance Abuse Program under

the Plan.  (Id.)  Plaintiff, a Pennsylvania resident, is a covered participant in the Plan.  (Id.)

### A.  The Plan Language

Under the Plan, CBH has full discretionary authority to interpret the terms of the Plan and

to determine eligibility for benefits.  (Id.)  The Plan provides that:

> [t]he determination of the Claims Administrator or Administrative
> Committee, as applicable, has full and exclusive discretionary
> authority to interpret all provisions of the Plans for which it is
> designated with responsibility for determining appeals, to
> determine material facts and eligibility for benefits, and to construe
> terms of the applicable Plan.  Interpretations and determinations
> made by the Claims Administrator, or Administrative Committee,
> as applicable, with respect to the Plan for which it is designated
> responsibility for determining appeals, will be final, conclusive and
> binding; unless it can be shown that the interpretation or
> determination was arbitrary and capricious.

(Administrative Record ("AR") 1126.)  Diagnosis and treatment of mental illness, depression,

and nervous disorders, as well as care for other emotional health needs, are covered by the Plan.

(Pl.'s Resp. Opp'n Summ. J. 2 (citing AR1015).)  Treatment at residential care facilities is also

covered by the Plan.  (Id. (citing AR1017, AR1189).)

To determine medical necessity and eligibility for residential treatment, CBH applies its

Level of Care Guidelines for Behavioral Health & Substance Abuse (Defs.' Mem. Supp. Summ.

J. 3 (citing AR0728–808).)  CBH has specific Level of Care Guidelines for Residential

Treatment Facilities for Children and Adolescents ("Level of Care Guidelines") which provide

that:

> In considering the appropriateness of any level of care, all basic
> elements of the medical necessity definition should be met:
>
> Except where state law or regulation requires a different definition,
> "Medically Necessary" or "Medical Necessity" shall mean health
> care services that a Provider, exercising prudent clinical judgment,

would provide to a patient for the purpose of evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are

(a) in accordance with generally accepted standards of medical practice;
(b) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and
(c) not primarily for the convenience of the patient or Physician, or other Physician, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

(AR0748.)

The Level of Care Guidelines further provide that:

The goal of Residential treatment is for stabilization of those symptoms that led to the admission and to facilitate a successful transition back to the community.  In addition residential treatment is a level of care where the expectation is that improvement to a substantially better level of functioning can occur through the active participation of the client in the recommended treatment. This is not identical to placement in a therapeutic group home, where the structure of the program manages behaviors without an expectation that the client actively cooperates with the recommended treatment.  This level of care is not meant primarily for the purpose of maintenance of gains made earlier in treatment.

(Id.)

The Guidelines for Continued Stay at the residential level of care provide as follows:

(All of the following must be met)
1. The child/adolescent continues to meet all basic elements of medical necessity.
2. The child/adolescent (and family as appropriate) has participated in the development of an individualized treatment plan, which includes consideration of all applicable and appropriate treatment modalities, realistic and achievable treatment goals, and a discharge plan with specific timelines for expected implementation and completion.  Despite active participation by the participant, the treatment plan implemented has not led to enough improvement in the child/adolescent's condition such that he/she cannot yet safely

move to and sustain improvement in a less restrictive level of care
as evidenced by:

- the child/adolescent continues to suffer from symptoms and/or
  behaviors that led to this admission; OR
- the child/adolescent has developed new symptoms and/or
  behaviors that require this intensity of service for safe and effective
  treatment; AND
- the facility is able to show that they are actively working to
  identify a comprehensive plan to support the child/adolescent's
  transition to a community setting.
3. The child/adolescent and family continue to participate in active
   weekly face-to-face (or an approved alternate schedule) family
   therapy.  Multi[-]family group is not a substitute for individual
   family therapy.

(AR0750.)

The Discharge Guidelines at the Residential treatment level of care provide as follows:

(Must meet one of the following)
1. Continued stay guidelines are no longer met.
2. Appropriate and timely treatment is available at a less restrictive
   level of care.
3. The child/adolescent has developed symptoms that require a more
   intensive level of care.
4. The child/adolescent has developed symptoms of a secondary
   condition that require admission to an acute care medical facility.

(Id.)

**B.  D.H.'s Condition Prior to Residential Treatment**

On April 10, 2012, Plaintiff called CBH regarding his interest in having his daughter

D.H., who was then seventeen years old, attend mental health residential treatment at Timberline

Knolls treatment facility in Lemont, Illinois.  (AR0234–35.)  Plaintiff reported to CBH that D.H.

had not eaten in three days and that Timberline Knolls had encouraged him to take D.H. to the

Emergency Room for medical clearance, which he had done the night before.  (AR0235.)

Plaintiff told CBH that he planned to take D.H. to Timberline Knolls on April 13, 2012.  (Id.)

D.H. was reportedly suffering from an eating disorder, suicidal ideation, self-injurious behavior,

Obsessive-Compulsive Disorder, and Borderline Personality Disorder.  (Id.)  During the phone

call, a CBH representative informed Plaintiff that there would be no guarantee that coverage for the requested care would be authorized because coverage would be based on clinical information and medical necessity level of care guidelines.  (Id.)  CBH approved D.H.'s initial stay at Timberline Knolls on April 16, 2012, for a stay which began on April 13, 2012.  (AR0238.)

During the initial inpatient review, Timberline Knolls reported that D.H. had no suicidal ideation, homicidal ideation, or psychosis.[2]  (AR0236.)  It also reported that D.H. had on one occasion previously attempted suicide, via overdose, at age fourteen.  (Id.)  D.H. reported that, since her discharge from an eating disorder partial hospitalization program at another facility called the Renfrew Center ("Renfrew"),

> she has had an increase in decreased energy, decreased motivation, difficulty completing [activities of daily living], not able to shower [on] a [regular] basis.  She was groomed upon admission.  [D.H.] reports a lot of depressive feelings, difficulty sleeping.  No specific precipitant listed for her decompensation since [discharge] from Renfrew.  [D.H.] is engaging in daily restricting and limiting hydration, didn't give daily kcal intake, but stated she's limiting cals, fats, and carbs.  [D.H.] has had a 15 lbs. weight loss since leaving Renfrew in March 2011 . . . .  No specific precipitant listed for her decompensation since [discharge] from Renfrew.

(Defs.' Mem. Supp. Summ. J. 5–6 (quoting AR0236).)  The review also noted that D.H. reported substance abuse issues, specifically "a history of marijuana abuse starting at age 14," but noted also that more than one year had passed since D.H. last used marijuana.  (Defs.' Mem. Supp. Summ. J. 6 (quoting AR0237).)  According to Plaintiff, D.H. has also reported a history of sexual abuse at age eleven by a female peer, and verbal-emotional abuse with bullying at age fifteen.  (Pl.'s Resp. Opp'n Summ. J. 6 (citing AR0550).)  D.H. was admitted to six different

---

[2] D.H. previously suffered suicidal ideation, and in April 2011 reported that she had "a million plans" for committing suicide and was scared because the suicidal thoughts were not triggered by anything and that she thought about it "every day and all the time."  (Pl.'s Resp. Opp'n Summ. J. 6 n.2 (quoting AR0121).)  Plaintiff also notes that D.H.'s file shows that Plaintiff informed CBH prior to her admission to Timberline Knolls that D.H. had been "endorsing [suicidal ideation] daily."  (Pl.'s Resp. to Defs.' Statement of Facts Supp. Mot. Summ. J. 7.)

facilities for treatment in the fifteen months prior to her admission to Timberline Knolls.[3]  (Id. (citing AR0373).)

CBH's case notes dated April 16, 2012 list the rationale for its authorization of D.H.'s residential treatment, including D.H.'s recent weight loss since being discharged from Renfrew and "increased restricting and reported overall [mental health] decompensation."  (Defs.' Mem. Supp. Summ. J. 6 (quoting AR0238).)  CBH noted that D.H. "appears appropriate for [residential treatment facility level of care] at this time for further assessment, [treatment], and stabilization, in order to prevent further decompensation and promote optimal level of functioning."  (Id.) CBH approved multiple extensions of coverage for D.H.'s continued stay at Timberline Knolls through May 8, 2012 "for the purpose of further stabilization of [mental health] and [eating disorder] symptoms, and to allow time for collaboration with [outpatient] providers and [discharge] planning time."  (Id. (quoting AR0240 and citing AR0243, AR0247).)

According to Plaintiff, Timberline Knolls' treatment goals for D.H. included returning D.H. to a healthy body weight and helping D.H. reach a point where she could complete her meals without assistance.  (Pl.'s Resp. Opp'n Summ. J. 1.)  Timberline Knolls estimated that D.H.'s treatment would take at least eight to ten weeks.  (Id.)  CBH approved D.H.'s treatment at Timberline Knolls for fewer than four weeks, with its approval covering treatment through May 8, 2012.  (Id.)

---

[3] D.H. was admitted to the Renfrew Center in November 2011 for treatment of depression and anorexia, but left after one week due to a cutting incident, after which she was admitted on an inpatient basis to Belmont Hospital, where she was diagnosed with borderline personality disorder.  (Pl.'s Resp. Opp'n Summ. J. 6.)  She then returned to the Renfrew Center for approximately one month before being stepped down to a partial hospitalization program, during which time she was hospitalized after another cutting incident.  (Id.)  In March 2012, D.H. was stepped down again to an intensive outpatient program where she "really struggled" and, upon discharge, went back to significantly restricting her food intake and sleeping most of the day. (Id. (citing AR0373, AR0550).)

### C.  <u>D.H.'s Condition While at Timberline Knolls</u>

While D.H. was at Timberline Knolls, she presented with depression and anxiety, continued cutting herself, and reported strong urges to hurt herself.  (Pl.'s Resp. Opp'n Summ. J. 7 (citing AR0239, AR0242).)  On April 30, 2012, Dr. Semone West, a psychiatrist at Timberline Knolls, informed CBH that D.H. was "motivated and her family is involved," but that D.H. continued to "struggle" with her eating disorder, still had "strong urges" to restrict food, needed prompting to eat, and was "fearful" of gaining weight.  (<u>Id.</u> at 7–8 (quoting AR0245).)  On May 3, 2012, D.H. was still "actively restricting most meals" and was "refusing to be weighed," eating about thirty percent of her meals, and continuing to struggle with body image issues and distortion.  (<u>Id.</u> at 8 (quoting AR0246).)  Timberline Knolls determined that D.H. needed one hundred percent compliance with her meal plan before she could step down to a lower level of treatment.  (<u>Id.</u> (citing AR0249).)  On May 8, 2012, D.H. was still restricting her food and eating seventy percent of her meals, was continuing to have urges to purge her food, and still did not want to gain weight.  (<u>Id.</u>)  D.H. had also broken her wrist when she fell out of bed, causing Timberline Knolls to be concerned about D.H.'s bone density in light of her eating disorder. (<u>Id.</u>)  Timberline Knolls also concluded that D.H. had a high relapse potential.  (<u>Id.</u>)

### D.  <u>CBH's Denial of Continued Residential Treatment</u>

On May 9, 2012, CBH sent D.H.'s case for peer review.  (Defs.' Mem. Supp. Summ. J. 6.)  CBH noted that D.H. was, at that time, "medically and psychologically stable, she d[id] not require 24 [hour] monitoring as she ha[d] not engaged in self-harming and is 90% [ideal body weight]."  (<u>Id.</u> (quoting AR0250).)  CBH noted also that D.H.'s body weight [was] currently stable" and she "could be transitioned to a lower [level of care] for ongoing support and weight maintenance."  (<u>Id.</u>)  CBH Peer Reviewer Vikram Shah, M.D., conducted the peer review by

telephone with D.H.'s treating therapist, Maria Cicero, LCPC, to determine if CBH's Level of

Care Guidelines for Child/Adolescent Psychiatric Residential Treatment were met as of May 9,

2012.  (Defs.' Mem. Supp. for Summ. J. 7.)  The case notes from the peer-to-peer review

between Dr. Shah and Counselor Cicero state: "[D.H.] wakes up late in the morning, every other

day.  No [suicidal ideation], no [homicidal ideation], no psychoses, [D.H.] has gained weight in

the program and eating meals.  In behavioral control.  [Eating disorder] behaviors: restricting

prior to admission.  Family situation: supportive, [t]aking care of [activities and daily living],

medically stable."  (Id. (quoting AR 0253).)

        Also on May 9, 2012, CBH denied further coverage for continued residential treatment at

Timberline Knolls, and that same day mailed an Initial Medical Necessity Denial letter to D.H.

and her provider, explaining that "[a]fter a review of the information submitted by your provider

and the terms of your benefit plan, Cigna's Peer Reviewer, Vikram Shah, M.D. [. . .], a board

certified psychiatrist, has determined that the requested services are not covered."  (Defs.' Mem.

Supp. Summ. J. 7 (quoting AR0430).)  The denial letter explained the clinical basis for Dr.

Shah's decision as follows:

> Based upon the available information, your symptoms do not meet
> the medical necessity criteria of Cigna Level of Care Guidelines
> for Residential Treatment Facilities (RTC) for Children and
> Adolescents for continued stay from 5/9/2012.  Available clinical
> information from the facility indicates that your admission
> symptoms have improved.  You are eating your meals and have
> gained weight in the program.  You are medically stable.  There is
> no current evidence of significant safety issues to self or others that
> would require the 24 hour monitoring of a residential program.
> You have been going to the groups and therapy and gaining insight
> into your issues.  Family meetings have been occurring.  Further
> treatment is available at a less restrictive level of care.

(Id. (quoting AR0430).)  The letter also contained details regarding appeal options, as well as

information about how to obtain CBH's Level of Care Guidelines online or in hard copy.  (Id.)

8

Plaintiff requested, through D.H.'s provider, an internal expedited first-level appeal of the denial.  A second CBH Peer Reviewer, Victoria Shampaine, MD, conducted a telephonic peer review with Timberline Knolls psychiatrist, Dr. Semone West, on May 11, 2012.  The case notes from the peer-to-peer review between Dr. Shampaine and Dr. West state that:

> She has been at this program for 3 weeks: she is doing a little better – she has depressive [complaints;] however her mood is more stable, she struggles a little at meals and needs staff support to complete, she is attending all therapy and her family is involved. She completes meals but has not assume[d] greater autonomy for self plating and food choices. [] She has urges to restrict and purge although has not engaged in these behaviors.  [] She had an unusual accident but this was not felt to be [self-injurious behavior].  No [self-injurious behavior] since her admission.  Her weight 112.2 with height 5 foot 4.  She was admitted at 105.6 arm cast, she is medically stable and her [vital signs] as stable.  She struggles with he[r] body image.  Discussed treatment [history] over the last year and expectations for additional [residential treatment center] programming.  [Treatment] goals include better management of depression and more independent eating. Discussed typical expectations for [partial hospitalization program] programming and the absence of acute concerns about her return to the home.

(Id. (quoting AR0257).)  On May 14, 2012 CBH notified D.H. and her provider by letter that it was denying her expedited first level appeal, explaining that "[a]fter a review of the information submitted and the terms of your benefit plan, we have decided to uphold the original decision not to authorize the requested services.  Cigna's Peer Review, Victoria C. Shampaine, M.D. [. . .], a board certified psychiatrist, has determined that the requested services are not covered."  (Id. at 8–9 (quoting AR0437).)  The letter explained the clinical basis for Dr. Shampaine's decision as follows:

> Based upon the available information, your symptoms do not meet the medical necessity criteria of Cigna Behavioral Health's Level of Care Guidelines for Child/Adolescent Psychiatric Residential Treatment, for continued stay from 05/09/2012 as you have made progress in your treatment and could safely continue your care in a

> less restrictive setting.  You are following your meal plan[4] although require verbal prompts.  You are medically stable and your weight is not significantly lower than your expected weight range.  Your mood has improved and you are not voicing thoughts or harming yourself.  Safe and effective treatment could be provided in a less structured setting.

(AR0437.)  The letter also included appeal options and information regarding how to obtain an online or hard copy version of the Level of Care Guidelines.  (Defs.' Mem. Supp. Summ. J. 9.)

Pursuant to Plaintiff's request for an internal expedited second level appeal, a third CBH Peer Reviewer, Alvin R. Blank, M.D., conducted a peer review with D.H.'s therapist, Maria Cicero, LCPC, on May 16, 2012.  (Id. (citing AR0264–40).)  The case notes from the peer-to-peer review between Dr. Blank and Counselor Cicero state:

> She adds that they are asking for additional time at this level of care because they "want to see consistency."  [D.H.] shows some [cooperation] and engagement on some days, but then regresses back to being oppositional [] and defiant of program expectations and actively avoiding engaging in [treatment].  For example, she misses many of her groups because she will not get out of bed all morning and not infrequently stays in bed until around 2 pm.  [] She is oppositional and defiant.  They place restrictions on her when this happens, but she tolerates this.  She is described as continuing to be guarded, withdrawn.

> I shared that I do not see such active oppositional behaviors as a primary [symptom] of depression, but a [symptom] of some need that [D.H.] has to be oppositional and to not engage in an alliance – such as trying to avoid going home, stay in control, etc.  Also, that I do not see continuation with [treatment] as likely to bring about significant change without changing from a day-to-day focus on daily symptoms and behaviors to a focus on the overriding problem of why she refuses to engage in [treatment] and to work to change – this can be done at any [location] and at the present time, there is no reason to expect further improvement at the present [location] with the same approach continuing as apparently has continued over the past year.

---

[4] Plaintiff disputes that D.H. was "following her meal plan" because "she was not doing so unless compelled to do so by Timberline Knolls' staff."  (Pl.'s Resp. Defs.' Statement of Facts Supp. Mot. Summ. J. 12 (citing AR0245, AR0257).)

(Defs.' Mem. Supp. Summ. J. 9–10 (quoting AR0256).)  In a letter[5] dated May 16, 2012, CBH

notified D.H. and her provider of its denial of her second level expedited appeal and explained

that, "[a]fter reviewing the appeal request submitted by Timberline Knolls as well as all

supporting documentation, including the benefit plan," Dr. Blank, a board-certified psychiatrist,

determined that it was appropriate for CBH "to uphold the original decision to deny the

residential treatment for" 5/9/2012 discharge.  (Defs.' Mem. Supp. Summ. J. 10 (quoting

AR0441).)  The denial letter contained the clinical basis for that decision as follows:

> Based upon the available information, [your] symptoms do not
> meet the medical necessity criteria of Cigna Behavioral Health's
> Level of Care Guidelines for Residential Treatment for Children
> and Adolescents for continued stay from May 9, 2012-forward as
> the treatment plan implemented has led to sufficient improvement
> so that [you] can safely move to and sustain improvement in less
> restrictive levels of care.  [You do] not continue to suffer from the
> acute symptoms and/or behaviors that led to this admission.  [You
> do] not have a significant co-existing acute medical or psychiatric
> condition    that    continues    to    require    24-hour    skilled
> psychiatric/medical services.  In addition, the clinical information
> available does not demonstrate that [you] are continuing to make
> significant gains in the proposed short or long term treatment
> goals.  This ongoing lack of significant progress appears to be a
> result of [your] active refusal to work with [your] treatment
> providers and to actively engage in [your] own treatment.[6]  Less
> restrictive levels of care are available for safe and effective
> treatment.

---

[5] Defendants note that the letter in the Administrative Record appears to be a copy of an internal
draft rather than the final version sent to Plaintiff on May 16, 2012, but indicates to the Court
that there are no substantive differences between the letters.  (Defs.' Mem. Supp. Summ. J. 10
n.2.)

[6] Plaintiff disputes that D.H. was not cooperating in her own treatment, noting that Dr. West told
CBH that D.H. was "motivated" to get better, that at the time of the external appeal, D.H. had
"finally accepted that she needs to be in a residential treatment facility," and that D.H. knew that
"she is now in the right place, a place that can treat all aspects of her condition."  (Pl.'s Resp.
Defs.' Statement of Facts Supp. Summ. J. 15 (quoting AR0245, AR0470).)  Plaintiff states that
although D.H. was showing oppositional tendencies, it was part of alternating behavior and that
D.H. was working to achieve "consistency."  (Pl.'s Resp. Defs.' Statement of Facts Supp. Summ.
J. 15 (citing AR0265).)

(Defs.' Mem. Supp. Summ. J. 10–11 (quoting AR0441–42).)  The letter also contained appeal information and details about how to obtain electronic or hard copies of the Level of Care Guidelines.  (Id. at 11.)

### E.  The Independent Review

On May 30, 2012, Plaintiff requested a review of CBH's second level appeal decision by an Independent Review Organization ("IRO").  (Id. at 11.)  Plaintiff also faxed a letter on May 31, 2012, attaching a "Summary of Treatment Recommendation" from the treatment team at Timberline Knolls, "references to industry studies," "American Psychiatric Association (APA) Practice Guidelines," a history of D.H.'s previous hospitalizations, a log of D.H.'s "food and drink intake in weeks prior to admission to Timberline Knolls," and a "Summary of Cigna denials."  (Id. (quoting AR0465–80).)  In their appeal, D.H.'s parents wrote that D.H. had made some improvement, but was still not healthy and would need to do significant work to recover.  (Pl.'s Resp. Opp'n Summ. J. 11.)  They also wrote that D.H. had difficulty getting up in the morning and had difficulty completing her meals, had only menstruated once or twice in the past year, and had been on walking restrictions due to weakness and dizziness.  (Id. (citing AR0468–69).)  D.H.'s parents reported that D.H. told them that if she had to leave Timberline Knolls, "she just wants to come home and die."  (Id.)  D.H.'s parents reminded CBH that step-down treatment had failed in the past, and that:

> [w]hile stepping down to partial hospitalization at this point is
> appropriate for some patients, in [D.H.'s] case her previous
> hospitalizations have shown that moving from a relatively short
> residential treatment program down to partial and then outpatient
> has been ineffective and led to quick relapse.  This has been tried
> multiple times without success, and we do not want to continue
> with the unhealthy and [] unproductive cycle of emergency room
> visits, hospital admissions and discharges.  We feel that at
> Timberline Knolls' comprehensive facility (which [D.H.] has

finally accepted) she is finally positioned to make a serious run at recovery.

(AR0470.)  Dr. West and two of D.H.'s therapists co-signed a letter on behalf of Timberline Knolls in support of Plaintiff's external appeal, informing CBH that D.H. "continues to struggle with disordered eating patterns, depression symptoms, mood dysregulation, impulsivity including recent elopement behavior, difficulty managing interpersonal relationships, and symptoms related to past trauma."  (Pl.'s Resp. Opp'n Summ. J. 12 (quoting AR0471).) Timberline Knolls was concerned about the "high risk of relapse" in light of D.H.'s "instability" if D.H. were stepped down to a lower level of care.  (Id. at 12–13.)  Due to those concerns, Timberline Knolls "advocate[d] for increased time . . . in the residential level of care."  (Id. at 13 (quoting AR0471).)

        In response to Plaintiff's request, CBH submitted evidence in D.H.'s case for external review by an IRO, MES Solutions, which was chosen at random and has no affiliation with CBH.  (Defs.' Mem. Supp. Summ. J. 11.)  CBH notified D.H., by letter dated June 13, 2012, that her claim had been submitted for independent external review and advised her that the decision of the independent review organization would be binding on Cigna and on D.H., aside from other remedies available under state and federal law.  (Id. (citing AR0481–82, AR0442).)  On July 16, 2012, MES Solutions issued its Notice of Independent Review Decision, in which it agreed with CBH's denial of coverage and agreed that D.H. did not meet the medical necessity criteria of CBH's Level of Care Guidelines for residential treatment from May 9, 2012 through discharge. (Id. at 12 (citing AR0547–53).)  In its Notice of Decision, MES Solutions listed the documents it reviewed, which included, among others, the materials submitted by Plaintiff and D.H.'s treatment providers to CBH by fax on May 31, 2012; additional information received from D.H. in June 2012, including a note from her treatment provider regarding office visits; the case notes

pertaining to D.H. for the applicable time period; the denial letters issued by CBH for D.H.'s

continued stay at Timberline Knolls dated May 9, May 14, and May 16, 2012; CBH's Level of

Care Guidelines; and the Plan.  (Id. (citing AR0549).)  In support of its determination, MES

noted that:

> The patient has stabilized at this level of care.  She has reached
> 90% of her weight.  She is not actively suicidal, though her parents
> report that she makes statements about suicide were she to return
> home.  She has been in treatment continuously since 2011.  She
> needs continued structured living and monitoring in order to keep
> up with her positive eating and coping skill habits, but she can gain
> the required assistance at lesser levels of care than acute residential
> treatment.  There is no evidence that a substantially better level of
> functioning can occur than the patient's current level of
> functioning, and she may require the aid of a therapeutic living
> situation in which expectations for improvement are not part of the
> clinical process, but she can gain ongoing support for her eating
> and coping skills needs.

(AR0552.)  Although it supported CBH's decision, MES Solutions also noted that at the time

CBH denied coverage, D.H.'s "mood is depressed and isolative.  She has difficulty getting out of

bed and would sleep all day if she could; the treatment team prompts her to be active . . . she

continues to present with a high relapse potential."  (Pl.'s Resp. Opp'n Summ. J. 13 (quoting

AR0550).)

## F.  D.H.'s Condition After Denial of Benefits[7]

D.H.'s parents decided to keep her at Timberline Knolls after CBH denied benefits for

her continued treatment there.  (Id. at 14.)  On June 29, 2012, D.H. was hospitalized when she

told Timberline Knolls she "wants to kill herself and her plan is to jump into the highway and get

killed by a car" and that "she just can't take living any more."  (Id. (quoting AR0285).)  At that

---

[7] Defendants argue that Plaintiff puts forth irrelevant facts about D.H.'s condition in the summer of 2012 through 2013.  As Defendants point out, CBH's internal appeal process concluded on May 16, 2012, and the materials reviewed by MES Solutions were current through May 31, 2012.  To the extent the facts in this subsection concerning events post-May 2012 are part of the Administrative Record in the case, the Court includes them in the recitation of facts.

time, CBH authorized six days of inpatient treatment at Linden Oaks Hospital due to D.H.'s "severe symptoms of depression with neurovegetative symptoms" and noted that D.H. "does not appear to be capable of functioning at a lower level of care."  (Id. (quoting AR0288, AR0535).)  D.H. was discharged from the hospital on July 6, 2012 and returned to Timberline Knolls, at which time CBH denied benefits for her stay there.  (Id. (citing AR0541–45).)  D.H. was discharged from Timberline Knolls on July 11, 2012 and returned to Pennsylvania with her parents.  (Id. (citing AR0301).)

After leaving Timberline Knolls, D.H. was treated at Presbyterian Children's Village, but her condition worsened after she experienced increasing food restriction and depression, and severely burned her hand and cut herself badly enough to need stitches, resulting in her admission to the Belmont Center for Comprehensive Treatment in October 2012.  (Id. (citing AR0303–04).)  Throughout 2012 and 2013 D.H. continued to receive treatment, but in July 2013 D.H. attempted to commit suicide by jumping out of the second story of a building.  (Id.)  She survived, but fractured her leg and was admitted to Bryn Mawr Hospital for one week.  (Id. at 15.)  While D.H. was at Bryn Mawr Hospital, the staff considered filing a commitment for her.  (Id. (citing AR0326).)

G. **Procedural History**

Plaintiff filed his Complaint on September 24, 2013.  Defendants filed their Answer on December 9, 2013.  Defendants filed a Motion for Summary Judgment on May 30, 2014.  The Administrative Record for this case was filed Under Seal on June 12, 2014.[8]  Plaintiff filed his Opposition to Defendants' Motion for Summary Judgment and Request for Summary Judgment

---

[8] Plaintiff opposes Defendants' Motion to File Documents Under Seal and asks this Court to deny Defendants' motion for leave to file the Administrative Record under seal and to order Defendants to instead redact the Administrative Record.  The Court will grant Defendants' Motion to File Documents Under Seal, and the Administrative Record in this matter will remain under seal as originally filed.

Pursuant to Rule 56(f) on June 27, 2014, along with a Response to Defendants' Statement of Facts. Defendants filed their Reply Brief in Support of Defendants' Motion for Summary Judgment on July 9, 2014. As the briefing process has been exhausted, Defendants' Motion for Summary Judgment and Plaintiff's Request for Summary Judgment Pursuant to Rule 56(f) are now ripe for judicial consideration.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

## III.   DISCUSSION

Plaintiff alleges that Defendants acted arbitrarily and capriciously in denying Plaintiff's benefits and denying all subsequent appeals, and that in doing so Defendants violated ERISA, its supporting regulations, federal common law of ERISA, and Pennsylvania common law regulating the construction and interpretation of insurance contracts. (Compl. ¶22.) Count One seeks damages and attorney's fees and enforcement of Plaintiff's rights and the rights of Plaintiff's child under the Plan and to clarify his rights and the rights of his child to future benefits under the terms of the Plan. (Id. ¶¶ 26–27.) Count Two requests equitable relief as follows: (1) restitution of all past benefits due to Plaintiff, plus pre-judgment and post-judgment interest; (2) a mandatory injunction requiring Defendants to immediately qualify Plaintiff and/or his dependent child for medical benefits due and owing under the Plan; and (3) any other necessary and proper relief the Court deems necessary to protect the interests of Plaintiff and his child under the Plan. (Id. ¶ 29.) The Court first addresses the applicable standard of review,

followed by Plaintiff's claims.  After careful consideration, the Court finds that summary

judgment for Defendant is appropriate with respect to the entirety of Plaintiff's Complaint.

A.     **Plaintiff's 29 U.S.C. § 1132(A)(1)(B) ERISA Claim**

1.     **The Applicable Standard of Review**[9]

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the United States

Supreme Court held that, when evaluating challenges to denials of benefits in actions brought

under 29 U.S.C. § 1132(a)(1)(B), district courts are to review the plan administrator's decision

under a *de novo* standard of review, unless the plan grants discretionary authority to the

administrator or fiduciary to determine eligibility for benefits or interpret the terms of the plan.

Id. at 115.  Thus when, as here,[10] discretionary authority is given to an administrator of a plan, a

---

[9] Plaintiff concedes that the standard of review is abuse of discretion and that there is no direct conflict of interest in Cigna's administration of the Plan.  (See Pl.'s Resp. Opp'n Summ. J. 16–17.)  Plaintiff argues, however, that Cigna has an indirect conflict of interest because Cigna has "a strong financial incentive to maintain [its] contractual agreements with benefit plans by reducing the cost of the benefit programs they administer."  (Pl.'s Resp. Opp'n Summ. J. 17 (citing Barnes v. BellSouth Corp., No. Civ.A.0316, 2003 WL 22399567, at *7 (W.D.N.C. Oct. 20, 2003)).)  According to Plaintiff, Cigna was subject to increased financial incentive to deny D.H.'s claim for residential treatment, because "Cigna is strongly motivated to keep the cost of Siemens' health plan low," particularly because "full-time residential treatment [] is among the most expensive types of care one can receive" and "it was clear that D.H. would need such care for an extended period given the seriousness of her condition."  (Pl.'s Resp. Opp'n Summ. J. 18.)

Defendant responds, stating that Plaintiff's argument "has no basis in Third Circuit law and asks the Court to totally eviscerate the arbitrary and capricious standard of review."  (Defs.' Mem. Supp. Summ. J. 3.)  Defendants argue that Plaintiff's reliance on non-binding case law from outside the Third Circuit is particularly misplaced because the Third Circuit does not recognize conflicts where an independent third party is paid to administer a plan funded by an employer.  (Id. at 4 (citing Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 383 (3d Cir. 2000), overruled on other grounds as recognized by Howley v. Mellon Fin. Corp., 625 F.3d 788 (3d Cir. 2010)).)

Having considered the parties' arguments regarding the appropriate standard of review, the Court will apply the abuse of discretion standard of review consistent with Third Circuit precedent as described in this subsection.

[10] Plaintiff concedes "[t]he Court's review of the administrative record [is] . . . to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations[.]" (Pl.'s Mot. Summ. J. 8 (citation omitted).)

deferential standard of "arbitrary and capricious" is applied.  Id. at 111; Estate of Schwing v. The Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009); Kalp v. Life Ins. Co. of N. Am., No. Civ.A.08-1005, 2009 WL 261189, at *1 (W.D. Pa. Feb. 4, 2009).  In such cases, a court may overturn a plan administrator's decision only if that decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law."  Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 387 (3d Cir. 2000), abrogated on other grounds, Schwing, 562 F.3d at 525; see also Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1141 (3d Cir. 1993) ("[W]hen the arbitrary and capricious standard applies, the decision maker's determination to deny benefits must be upheld unless it was 'clear error' or 'not rational.'") (internal quotation omitted).  "The scope of this review is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.'"  Doroshow v. Hartford Life & Accident Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009) (quoting Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)); see also Howley, 625 F.3d at 793; Brown v. First Reliance Standard Life Ins. Co., No. Civ.A.10-486, 2011 WL 1044664, at *5 (W.D. Pa. Mar. 18, 2011).  Such a deferential review "promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation."  Conkright v. Frommert, 559 U.S. 506, 508 (2010).  The fact that the plan administrator is also the payor of claims does not raise the level of scrutiny, but may be considered as a factor among all others when determining whether a plan administrator has abused its discretion.  Morgan v. The Prudential Ins. Co. of Am., 755 F. Supp. 2d 639, 642 (E.D. Pa. 2010) (citing Ellis v. Hartford Life and Accident Ins. Co., 594 F. Supp. 2d 564, 567 (E.D. Pa. 2009)).

On a motion for summary judgment in an ERISA case where the plaintiff claims that benefits were improperly denied, a reviewing court is generally limited to the facts known to the

plan administrator at the time the decision was made.  Post v. Hartford Ins. Co., 501 F.3d 154,

168 (3d Cir. 2007), overruled on other grounds, 574 F.3d 230 (3d Cir. 2009).  "Consequently,

when, as here, a plaintiff alleges that a plan administrator, such as [the Fund's Trustees], abused

its discretion in deciding to terminate benefits, [the Court] generally limit[s] [its] review to the

administrative record, that is, to the 'evidence that was before the administrator when [it] made

the decision being reviewed.'"  Sivalingam v. Unum Provident Corp., 735 F. Supp. 2d 189, 194

(E.D. Pa. 2010) (quoting Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997)); see

also Johnson v. UMWA Health & Ret. Funds, 125 F. App'x 400, 405 (3d Cir. 2005) ("This

Court has made clear that the record for arbitrary and capricious review of ERISA benefits denial

is the record made before the Plan administrator, which cannot be supplemented during the

litigation.").

Defendants argue that the decision to deny coverage was not arbitrary and capricious,

because: (1) it was no longer medically necessary for D.H. to receive continued behavioral health

residential treatment because her condition had improved and stabilized, D.H. could continue to

receive care at a lesser level, and CBH made that decision based on the applicable Level of Care

Guidelines, case notes, and peer-to-peer reviews conducted with D.H.'s treating practitioners;

and (2) CBH's initial determination was upheld by two additional, board-certified Peer

Reviewers who were not engaged in the initial claim determination, and was subsequently, at

Plaintiff's request, reviewed and upheld by an outside, independent review organization selected

at random.  Plaintiff responds by arguing that Defendants' decisions to deny coverage were not

well-reasoned and were not supported by substantial evidence, and therefore Plaintiff's claims

for benefits should not have been denied.[11]

---

[11] Plaintiff also argues that CBH is not entitled to discretionary authority when interpreting its
level of care guidelines, even though it is entitled to discretionary authority in its interpretation of

## 2. **Defendants' Initial Decision to Deny Coverage**

Defendants argue that CBH applied the Plan Guidelines and reasonably determined that D.H. did not satisfy the medical necessity criteria.[12]  Specifically, Defendants assert that CBH appropriately followed the Level of Care Guidelines in making a determination that D.H.'s continued treatment at the residential level of care was not medically necessary.  Plaintiff argues that D.H. had not improved to the point where residential care was no longer necessary, because she consistently presented with depression and anxiety, reported strong urges to hurt herself, cut herself, restricted meals, was ambivalent about recovery, and had urges to purge her food.  Timberline Knolls felt that D.H. had a high relapse potential, had not reached her treatment goals of 99% of her ideal body weight and 100% compliance with her meal plan, and would need eight to ten weeks of treatment at their facility.

The CBH Level of Care Guidelines for Continued Stay required that all of the following conditions be met:

1. The child/adolescent continues to meet all basic elements of medical necessity.
2. The child/adolescent (and family as appropriate) has participated in the development of an individualized treatment plan, which includes consideration of all applicable and

---

Plan language.  (See Pl.'s Resp. Opp'n Summ. J. 19.)  In support of this argument Plaintiff cites to Egert v. Connecticut General Life Insurance Company, where the United States Court of Appeals for the Seventh Circuit found it was error to defer to the claim administrator's internal guidelines where the plan provided no rules or direction regarding the treatment at issue in that case.  (Id. (citing Egert, 900 F.2d 1032, 1036 (7th Cir. 1990)).)  Defendant responds by arguing that (1) the Egert court correctly applied an abuse of discretion standard in reviewing the decision, and (2) the discrepancy in that case concerned whether in vitro fertilization was an essential treatment for infertility, which was defined as an illness in the plan at issue, not whether the defendant was entitled to discretionary authority when interpreting its own level of care guidelines.  (Defs.' Reply Supp. Mot. Summ. J. 5 (citing Egert, 900 F.2d at 1038).)  For the purposes of this summary judgment motion, the appropriate standard of review is the abuse of discretion standard of review as applied in the Third Circuit.

[12] In support of their argument, Defendants cite to numerous factually similar cases from outside the Third Circuit.  As those opinions are not binding on this Court, they will not be related here.

appropriate treatment modalities, realistic and achievable treatment goals, and a discharge plan with specific timelines for expected implementation and completion. Despite active participation by the participant, the treatment plan implemented has not led to enough improvement in the child/adolescent's condition such that he/she cannot yet safely move to and sustain improvement in a less restrictive level of care as evidenced by:

- the child/adolescent continues to suffer from symptoms and/or behaviors that led to this admission; OR
- the child/adolescent has developed new symptoms and/or behaviors that require this intensity of service for safe and effective treatment; AND
- the facility is able to show that they are actively working to identify a comprehensive plan to support the child/adolescent's transition to a community setting.

3. The child/adolescent and family continue to participate in active weekly face-to-face (or an approved alternate schedule) family therapy. Multi[-]family group is not a substitute for individual family therapy.

(AR0750.) CBH determined that D.H. did not meet the first factor because residential stay treatment was no longer medically necessary, which under the Guidelines required that the services were "clinically appropriate, in terms of type, frequency, extent, site and duration," "not primarily for the convenience of the patient," and "not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease." (AR0748.) CBH determined that D.H. did not meet the second factor because D.H.'s stay at Timberline Knolls through May 8, 2012 had led to enough improvement that she could safely move to and sustain the improvement in a less restrictive level of care than residential treatment. The Guidelines provided that discharge from residential stay treatment was appropriate when the "[c]ontinued stay guidelines are no longer met" or "[a]ppropriate and timely treatment is available at a less restrictive level of care." (AR0750.)

22

As stated above, the Level of Care Guidelines provide that:

> The goal of Residential treatment is for **stabilization of those symptoms that led to the admission and to facilitate a successful transition back to the community**.   In addition residential treatment is a level of care where the expectation is that improvement to a substantially better level of functioning can occur through the active participation of the client in the recommended treatment.   This is not identical to placement in a therapeutic group home, where the structure of the program manages behaviors without an expectation that the client actively cooperates with the recommended treatment.   **This level of care is not meant primarily for the purpose of maintenance of gains made earlier in treatment**.

(AR0748 (emphasis added).)

As of May 9, 2012, when CBH denied coverage for continued stay based on information from D.H.'s providers at Timberline Knolls, D.H. was medically and psychologically stable, had not engaged in self-harming, was at 90% of her ideal body weight, and was not exhibiting suicidal ideation.   Overall, her admission symptoms had improved, and while she was still experiencing symptoms of depression and her eating disorder, she could obtain further treatment at a lower level of care than twenty-four hour residential treatment.   Accordingly, D.H.'s status at that time was such that she had achieved the goals of residential treatment as described in the Level of Care Guidelines, and no longer met the requirements for coverage of continued stay in residential treatment.   It was not, therefore, arbitrary and capricious for CBH to deny coverage for D.H. to remain at Timberline Knolls beyond May 8, 2012.

### 3.   Plaintiff's Appeals of the Denial of Coverage, the Peer Reviews, and the Independent Review

Defendants argue that CBH did not abuse its discretion in the initial denial of coverage, and that the professional opinions and reasonable justifications underlying the subsequent peer reviews, which each concluded that D.H. did not meet the medical necessity for continued

residential stay, support the initial denial.  Plaintiff argues that D.H. had not met the treatment

goals Timberline Knolls established as of May 8, 2012, and that she had not improved to a point

where residential care was no longer necessary.

The second peer review case notes related to the first level appeal reflect a

comprehensive discussion between the Timberline Knolls psychiatrist and the CBH reviewer.

D.H.'s improvements in mood and eating were compared with those areas in which she

continued to struggle; her urges to restrict and purge, which she had not actually acted on, were

mentioned; her height, weight, vital statistics, and medical stability were discussed; her goals and

expectations were discussed; and finally, "the absence of acute concerns about her return to the

home" were detailed.  (AR0257.)  The bases for the denial of the first level appeal included

D.H.'s progress with regard to meals, the fact that she was medically stable and was no longer

significantly underweight, and that she showed an improved mood and was not voicing thoughts

of or actually harming herself.  (AR0437.)

The third peer review case notes related to the second level appeal also show that CBH's

peer reviewer had a meaningful discussion with D.H.'s therapist about D.H.'s improvement, as

well as the areas where she needed additional improvement, including actively participating in

treatment, which at the time of the peer review she was not doing consistently.  The bases for the

denial of the second appeal included D.H.'s improvement and the fact that she was no longer

suffering from the acute symptoms and behaviors that led to her admission to Timberline Knolls,

she did not have a condition that continued to require twenty-four hour monitoring, and she

exhibited a lack of ongoing progress due in part to her active refusal to work with her treatment

providers and actively engage in her own treatment.  (AR0441–42.)

CBH also submitted its decision for an independent review at Plaintiff's request. Documents in the Administrative Record show that prior to upholding CBH's initial decision to deny coverage for D.H. to remain at Timberline Knolls after May 8, 2012, MES Solutions considered records from CBH's file regarding D.H. as well as documentation and letters from D.H.'s parents.  After reviewing those items, MES Solutions agreed with CBH that D.H. did not meet the medical necessity criteria of CBH's Level of Care Guidelines, as she had stabilized at the residential level of care, had reached ninety percent of her ideal body weight, and was not actively suicidal.  (AR0552.)  MES Solutions stated that while D.H. needed continued structured living and monitoring, she could gain the assistance she needed at a level of treatment lower than acute residential treatment, and that a program where D.H. could gain ongoing support for her eating and coping skills needs might be more appropriate than the goals of the Timberline Knolls program, which were focused on continual improvement.[13]  (Id.)

At each level of review following CBH's initial denial of coverage as of May 9, 2012, the Plan language and level of care guidelines were weighed against D.H.'s condition and symptoms as of the date of denial.  Each appeal from CBH's decision to deny coverage was followed by a new peer review with D.H.'s treating physicians and therapists.[14]  Each review referenced specific medical evidence regarding D.H.'s symptoms and improvement, as well as the pertinent

---

[13] According to Plaintiff, Timberline Knolls believed D.H. had a high relapse potential, but as Defendants point out, under the Plan, residential treatment is not intended for long-term care to maintain improvements—it is intended to stabilize symptoms that led to admission and to facilitate a successful transition back to the community.

[14] Defendants also dispute Plaintiff's allegation in the Complaint that CBH contradicted the basis for its denial of the first level appeal by referencing, in the second level appeal denial letter, D.H.'s refusal to work with her treatment providers as an additional basis for the denial.  In the May 16, 2012 letter, Dr. Blank addressed updated clinical information that D.H.'s counselor provided regarding D.H.'s "defiant" behavior and the fact that she was actively avoiding engaging in treatment.  The additional reason, D.H.'s lack of cooperation and active participation in treatment, does not contradict the other bases for CBH's decision and appeal denials, and is not evidence of arbitrary and capricious decision-making.

language in the Level of Care Guidelines, in concluding that D.H.'s continued stay at Timberline

Knolls was not medically necessary beyond May 8, 2012.  Finally, Defendants submitted D.H.'s

case to an independent review organization, which agreed that CBH's denial of continued

residential treatment for D.H. was proper.  Although the decision to deny coverage as of May 9,

2012 may have been a close call, it was not arbitrary and capricious for CBH to determine, in

light of the Plan language, the relevant level of care guideline provisions, and D.H.'s condition,

that D.H. could receive appropriate treatment as a lower level of care than the residential

treatment she had been receiving at Timberline Knolls.  As CBH's denial of coverage was not

arbitrary and capricious, the Defendants' Motion for Summary Judgment must be granted.

### 4.  D.H.'s Condition Subsequent to CBH's Determination

As noted above, Defendants argue that Plaintiff injects irrelevant facts into its argument,

and that events pertaining to D.H.'s condition which occurred post-May 2012 "are not usually

relevant to the inquiry of whether the administrator abused its discretion."  (Defs.' Reply Supp.

Mot. Summ. J. 6 (quoting Howley v. Mellon Fin. Corp., 625 F.3d 788, 793 (3d Cir. 2010)).)

Generally, courts "must base their review of an administrator's decision on the materials that

were before the administrator when it made the challenged decision."  Howley, 625 F.3d at 793.

The facts in the Administrative Record and Plaintiff's brief have been reviewed for the purpose

of obtaining a more complete understanding of D.H.'s condition, even though the Court's review

is generally limited to the same portions of the Record which were before CBH when it made the

initial denial of coverage on May 9, 2012.  While subsequent events may indicate that D.H.

would have benefitted from further residential treatment at Timberline Knolls, it was not

arbitrary and capricious, as discussed above, for CBH to conclude as of May 9, 2012 that, based

on the improvement of D.H.'s symptoms and the availability of treatment at a lower level of

care, it was no longer medically necessary for D.H. to remain in continued residential treatment. Accordingly, summary judgment for Defendants is appropriate.

**IV.    CONCLUSION**

Having reviewed the parties' briefs and the Administrative Record, and having reviewed the arguments of counsel, the Court finds that Plaintiff has not set forth evidence that would enable a jury to reasonably find in his favor.  Accordingly, the Court shall grant Defendant's Motion for Summary Judgment in its entirety.

An appropriate Order follows.